**Opinion issued July 3, 2003**



In The

*Court of Appeals*

For The

*First District of Texas*

_____

NO. 01-01-00063-CR

_____

PABLO CIENFUEGOS, Appellant

V.

THE STATE OF TEXAS, Appellee

**On Appeal from the 351st District Court**
**Harris County, Texas**
**Trial Court Cause No. 779,383**

## O P I N I O N

A jury found appellant, Pablo Cienfuegos, guilty of the offense of capital

murder.[1]  Because the State did not seek the death penalty, the trial court automatically assessed appellant's punishment at confinement for life.[2]  In ten points of error,[3] appellant contends that the trial court erred in admitting, over his objection, hearsay testimony; the evidence is legally and factually insufficient to support his conviction; the trial court erred in denying his motion to suppress identification evidence in violation of his constitutional rights to due process[4] and due course of law;[5] his conviction for capital murder under the conspiracy theory of the law of parties[6] violated his constitutional rights to due process and due course of law; and the mandatory imposition of a life sentence upon his conviction for capital murder

---

[1]  TEX. PEN. CODE ANN. § 19.03(a)(2) (Vernon 2003).

[2]  TEX. PEN. CODE ANN. § 12.31(a) (Vernon 2003); TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1 (Vernon Supp. 2003).

[3]  In what he designates as "point of error eleven," appellant asserts that this Court erred in denying his motion to abate this appeal. On December 6, 2001, this Court denied appellant's motion to abate the appeal and remand the case to the trial court for an out-of-time motion for new trial. Subsequently, on January 31, 2002, this Court issued an order denying appellant's motion for rehearing and rehearing en banc of his motion to abate the appeal. Appellant's eleventh point of error is, in essence, a further motion for rehearing. As such, it is improperly presented. TEX. R. APP. P. 49.1, 49.5.

[4]  U. S. CONST. amend. XIV.

[5]  TEX. CONST. art. I, § 13.

[6]  TEX. PEN. CODE ANN. § 7.02(b) (Vernon 2003).

2

under the conspiracy theory of the law of parties violated his constitutional rights against cruel and unusual punishment.[7] We affirm.

## Background

Perla Mercedes, the wife of the complainant, Teodoro Mercedes, testified that, on the evening of December 28, 1997, she drove her car, with her infant daughter in the backseat, into the parking space outside of their apartment and a white four-door car, which looked similar to a police car, pulled in behind her car and blocked her in. As Mercedes attempted to reverse her car, two men approached her from both sides of her car. Jorge Gonzales walked up to the driver's side window and showed Mercedes a badge around his neck, identifying himself as a police officer. The other man, who was never identified, tapped on the passenger's side window with a handgun. Mercedes put the car in park and unlocked the car doors because she thought the men were police officers.

Gonzales then pulled Mercedes by her hair out of her car, threw her into the back seat of the white car, called Mercedes a "bitch," and demanded money. Gonzales asked the driver of the white car for handcuffs, and Gonzales then handcuffed Mercedes's arms behind her back. Mercedes made eye contact in the rear view mirror with the driver, a third man, whom she later identified as appellant.

---

[7]     U. S. CONST. amend. VIII; TEX. CONST. art. I, § 13.

3

Appellant sped the car away from the apartment, and Gonzales struck Mercedes in the head and told her he was going to kill her. Mercedes pleaded for her baby and offered Gonzales the remote control to her garage. Appellant then drove the white car into the garage, and Gonzales pulled Mercedes out of the car and instructed appellant to remove the white car from the garage.

After everyone was inside the garage, Gonzales then dragged Mercedes up a staircase to her apartment door. When Mercedes complained that the handcuffs were on too tight, Gonzales responded, "just wait until I put my testicles in you." The unidentified assailant brought the baby, in her infant carrier, to the top of the stairs. Mercedes then told the men that she could not remember the code to the apartment's alarm system and that she needed to punch in the code by herself. While Gonzales and the unidentified assailant looked for something in the garage to release the handcuffs, appellant stayed at the top of the stairs with Mercedes and the baby.

When the other two men returned to the top of the stairs, the garage door began to open and Mercedes told the men that it was her husband. Again, appellant stayed with Mercedes at the top of the stairs, and Gonzales and the unidentified assailant went back down the stairs and into the garage. At this point, Mercedes heard sustained gunfire and attempted to shield her baby from harm. After the gunfire ceased, Gonzales ran back up the stairs and told Mercedes not to turn around or

4

move. After Mercedes waited long enough for the men to drive away, she ran downstairs and saw her husband bleeding to death on the garage floor.

Mercedes then ran for help and a neighbor assisted her in calling 9-1-1. She returned to the garage, took her husband's keys and opened the apartment door, allowing the home alarm to go off. She then contacted the alarm company, informing it that her husband had been shot and was dying.

The record reveals that, subsequent to the shooting, Houston Police officers found an unfired, loaded 9 millimeter handgun under the complainant and recovered sixteen shell casings from the scene, all of which had been fired from the same gun. Officers also found, on the driver's side window of Mercedes's car, a latent fingerprint that belonged to Gonzales. Based on a photographic array, Mercedes later identified Gonzales as the man with the badge. After arresting and speaking with Gonzales, investigators came to suspect appellant as the driver of the white car and a man named "Conde" as the unidentified assailant who tapped on Mercedes's car window with a handgun.

Pursuant to further investigation, officers saw a white, four-door Ford Crown Victoria parked outside of appellant's home. The car was owned by appellant and matched Mercedes's description of the white car driven by appellant on the evening of the murder. On April 1, 1998, officers arrested appellant near his home as he was

5

driving a red Isuzu sedan, in which officers found an envelope with the name "Conde" and a telephone number written on it. Mercedes subsequently identified appellant in a live lineup as the man who drove the white car on the night of the murder.

The charge in this case authorized the jury to convict appellant under three theories of capital murder: (1) as a principal, (2) as a party, or (3) as a conspirator. In regard to the conspiracy theory, the application paragraph of the charge reads as follows:

> Now, if you find from the evidence beyond a reasonable doubt that . . . the defendant, Pablo Cienfuegos, and Jorge Alberto Gonzales and an unknown Hispanic male entered into an agreement to commit the felony offense of kidnapping of Perla Mercedes, and pursuant to that agreement, if any, they did carry out their conspiracy and that . . . in the course of committing such kidnapping of Perla Mercedes, Jorge Alberto Gonzales and an unknown Hispanic male intentionally caused the death of Teodoro Mercedes by shooting Teodoro Mercedes with a deadly weapon, namely a firearm, and that the death of Teodoro Mercedes was an offense that the defendant should have anticipated as a result of carrying out the conspiracy, then you will find the defendant guilty of capital murder, as charged in the indictment.

After being so charged, the jury returned a general verdict finding appellant guilty of capital murder.

**Hearsay Testimony**

In point of error one, appellant contends that the trial court erred in admitting,

over his objection, the "inadmissible hearsay" testimony of a police officer. After the police obtained Gonzales's fingerprint from Mercedes's car and Mercedes positively identified Gonzales as one of the assailants, Houston Police Officer U. P. Hernandez arrested and interviewed Gonzales. Following that interview, appellant became a suspect in the case.

On appeal, appellant argues that "Hernandez' [sic] testimony told the jury that what Gonzales told him provided enough probable cause to get a warrant for [appellant's] arrest." Appellant contends that the "State's intention was to inform the jury of the contents of the statements without calling the declarant, Gonzales, as a witness, presenting a clear hearsay problem." He asserts that "the cumulative and damaging effect of this hearsay deprived him of his constitutional right to a fair trial and to confront and cross-examine his accusers."

Appellant complains of the following testimony:

| [State]: | All right, now before I ask you any further questions, Officer Hernandez, I want to advise you as I will advise counsel and, Your Honor, out of an abundance of caution to the Court, I am not asking to you [sic] say anything that anybody said to you, okay? |
|---|---|
| [Officer]: | Okay. |
| [State]: | But once Jorge Gonzales was arrested, did you personally come into contact with him? Did you |

|  |  |
|---|---|
| | personally see him and come into contact with him? |
| [Officer]: | Yes, I did. |
| [State]: | Okay. Did you talk to him? |
| [Officer]: | I did. |
| [State]: | I don't want to go into what you talked about, but at this point in your investigation after arresting Mr. Gonzales and talking to him, did you proceed to do something else with regards to the investigation? |
| [Officer]: | Yes, sir, I did. |
| [State]: | What did you do next after all of that? |
| [Officer]: | *I followed up some information that I received.* |
| [Appellant]: | *Excuse me, back door hearsay.* |
| [State]: | No—I'm not, I'm being very careful. I'm sorry [appellant's counsel], I didn't. |
| [The Court]: | Ladies and gentlemen, please retire to the jury room. |
| (Jury retired.) | |
| [The Court]: | Officer Hernandez, so it's clear as I can possibly make it, you cannot make any reference to anything he said, you can't talk about anything he said. You can't vaguely refer to anything he said. |
| | And when you're asked what you did, he's asking you what did you physically do. Okay? I want to make that as clear as I can possibly make it. You know, in no way, shape or form, can you refer in any |

8

way to what Mr. Gonzales said.

[Officer]:    Okay.

[State]:    For the record, we've have [sic] talked about that before he testified and I want the record to reflect and I know counsel knows me, I'm not trying to do any backdoor hearsay. I stopped it there and I want to go on.

[Appellant]:    *Again, I object to the question. I object to the response, not the question.*

[The Court]:    *I understand. All right, let's go ahead and take a bathroom break since we have them out.*

(Short recess taken.)

[Appellant]:    Again, we're stipulating that there is nothing wrong with the arrest of the Defendant. *Therefore, any mention of him going out and arresting the Defendant is not relative to any material issue.* And, in fact, it should not be considered as evidence of guilt.

And the reason that's put in the Charge is that, obviously, the jury will imply some prejudice without the instruction. But we're not contesting the legality of the arrest, even the legality of putting him in the lineup. There was a contesting of the nature of the lineup.

But as far as I'm concerned and, of course, the State already knows this, they put him in a lineup and *we object to going into even the arrest.*

[The Court]:    Overrule the objection. Let's go.

9

| [Appellant]: | *Can we have a running objection to any testimony about the arrest from this officer?* |
|---|---|
| [The Court]: | Absolutely. Yes, you can. |

(Emphasis added.) The record reveals that the State then elicited testimony from Officer Hernandez regarding the actual facts and circumstances surrounding appellant's arrest. Appellant directs us to no other testimony by Hernandez, and we have found none, concerning what Gonzales may have told Hernandez. Nor does appellant point out any other testimony by Hernandez from which any inference could possibly be made that Gonzales implicated appellant.

As set out above, appellant made two very different objections at different times. First, appellant objected to "backdoor hearsay" when Officer Hernandez testified that he "followed up some information that I received" after he spoke with Gonzalez. The record reveals that, after the State explained its position outside the presence of the jury and appellant re-urged his objection to Hernandez's response, the trial court did not rule on the objection.[8] The trial court noted, "I understand," and took a short recess. To preserve error for appeal, a complaining party must not only object, but must also obtain an adverse ruling on the record, unless the trial court refuses to rule on the objection and the complaining party objects to the refusal. TEX.

---

[8] The record does not support the concession made by the State in its brief that "the trial court overruled appellant's objection."

10

R. APP. P. 33.1. Here, appellant neither obtained an adverse ruling nor objected to the trial court's ambiguous response. Thus, appellant failed to preserve error in regard to his "backdoor hearsay" objection.

Second, after the recess, appellant changed tactics and, instead of objecting to hearsay, objected that any discussion of appellant's arrest was *"not relative* to any material issue." After the trial court overruled this objection, appellant asked for "a running objection to any testimony about the arrest" from Officer Hernandez. Although appellant obtained a ruling on his relevance objection, this objection does not comport, on appeal, with his point of error that the trial court erred in admitting hearsay testimony. TEX. R. APP. P. 33.1; *Wilson v. State*, 71 S.W.3d 346, 349 (Tex. Crim. App. 2002).

We overrule point of error one.

## Sufficiency of the Evidence

In points of error two and three, appellant contends that the evidence was legally and factually insufficient to support his conviction for capital murder. In point of error six, appellant contends that the evidence was factually insufficient to prove his identification.

We review the legal sufficiency of the evidence by viewing it in the light most favorable to the verdict to determine if any rational fact finder could have found the

11

essential elements of the crime beyond a reasonable doubt. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). Although our analysis considers all evidence presented at trial, we may not re-weigh the evidence and substitute our judgment for that of the fact finder. *Id.*

The factual sufficiency of the evidence is reviewed by examining all of the evidence neutrally and asking whether the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is greatly outweighed by contrary proof. *Johnson v. State*, 23 S.W.3d 1, 11 (Tex. Crim. App. 2000).

Under the law applicable in this case, a person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation. TEX. PEN. CODE ANN. § 19.03(a)(2). A person commits the offense of kidnapping if he intentionally or knowingly abducts another person. *Id.* § 20.03(a) (Vernon 2003).

Under the law of parties, a person is criminally responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the

12

other person to commit the offense. *Id.* § 7.02(a)(2) (Vernon 2003). Moreover, if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, all conspirators are guilty of the felony actually committed, though having no intent to commit it, if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy. *Id.* § 7.02(b) (Vernon 2003). A person commits criminal conspiracy if, with intent that a felony be committed, he agrees with one or more persons that they or one or more of them engage in conduct that would constitute the offense. *Id.* § 15.02(a)(1) (Vernon 2003).

In regard to legal sufficiency, appellant agues that the evidence does not show that he acted, as a principal, a party, or a conspirator, with the culpability required to support his conviction for capital murder. He contends that there is no evidence "of any word or agreement" by him "to promote or assist the conduct" of the principal in committing capital murder and no evidence of "actions or words that would show an understanding and common design to commit the forbidden act." Appellant also argues that there is no evidence that he had a gun or that he knew anyone had a gun.

However, the evidence, viewed in a light most favorable to the verdict, amply supports appellant's conviction under the conspiracy theory of the law of parties. The record indicates that appellant drove the white car used during the abduction of Perla

Mercedes. He pulled the white car in behind her car, preventing her escape. Appellant then waited in the white car as Gonzalez went to Mercedes's car with a fictitious badge and the unidentified assailant tapped on her window with a handgun. After Gonzales pulled Mercedes by her hair and threw her into the white car, Gonzales asked appellant for the handcuffs that were used to restrain Mercedes. Gonzales also told Mercedes, in appellant's presence, that he was going to kill her. Furthermore, appellant kept watch over Mercedes and her baby when Gonzalez and the unidentified assailant went to confront the complainant and murder him. After the shooting, appellant fled the scene in the white car with Gonzales and the unidentified assailant.

There is abundant evidence that appellant and the two other assailants agreed to and, in fact, acted in concert to abduct Mercedes. There is also ample evidence to support a jury finding that appellant should have anticipated that someone could be killed as a result of carrying out the kidnapping. Moreover, it is undisputed that, during the course of the kidnapping, Gonzales and the second man intentionally caused the death of Teodoro Mercedes by shooting him with a firearm. Accordingly, we hold that the evidence was legally sufficient to support appellant's conviction for capital murder as a conspirator under section 7.02(b).

In regard to factual sufficiency, appellant merely reiterates that "the record is

14

devoid of any facts to support a finding of guilt" and that Mercedes's identification of him did not meet the standard for factual sufficiency. Mercedes positively identified appellant, both in a live lineup and in court, as the driver of the white car on the evening of the murder. There was also evidence that appellant actually owned a white car which matched Mercedes' description and that a piece of paper, found in appellant's possession when he was arrested, had the name and telephone number of another suspect written on it.

Appellant directs us to no evidence, and we have found none, that supports his conclusory argument that the evidence was factually insufficient to support his identification and conviction. Based on our review of the record, and giving proper deference to the jury's finding as the trier of fact, we hold that the evidence was factually sufficient to support appellant's conviction for capital murder as a conspirator under section 7.02(b).

Because the jury returned a general verdict, and because the evidence is both legally and factually sufficient to support a finding of guilt under section 7.02(b), the verdict must be upheld. *Rabbini v. State*, 847 S.W.2d 555, 558 (Tex. Crim. App. 1992).

We overrule points of error two, three, and six.

15

## Identification

In points of error four and five, appellant contends that, in violation of his constitutional rights to due process and due course of law, the trial court erred in denying his motion to suppress both Mercedes' pretrial lineup identification and her in-court identification of appellant as the driver of the white car. Appellant argues that the pretrial lineup identification procedure was impermissibly suggestive because he was the only person in the lineup wearing a red shirt and because of the disparity in the ages, weights and appearances of the other lineup participants.

The standard of review on a claim that an in-court identification should not have been admitted due to the taint of an impermissibly suggestive pretrial identification procedure is set forth in *Loserth v. State*, 963 S.W.2d 770 (Tex. Crim. App. 1998). The standard of review depends upon the type of question presented to the reviewing court. *Id.* at 772. First, as a general rule, we must give almost total deference to a trial court's determination of historical facts supported by the record, especially when the trial court's fact findings are based on an evaluation of the credibility and demeanor of the witnesses. *Id.* Second, we give the same amount of deference to the trial court's rulings on "application of law to fact questions," also known as "mixed questions of law and fact," if the resolution of those questions turns on an evaluation of credibility and demeanor. *Id.* Finally, we review de novo "mixed

16

questions of law and fact" that do not fall within the second category. *Id.* In this case, the question of whether an identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of misidentification is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *Id.* at 772-73. Accordingly, we apply a de novo standard of review.

A pretrial identification procedure may be so suggestive and conducive to mistaken identification that subsequent use of that identification at trial would deny the accused due process of law. *Simmons v. United States*, 390 U.S. 377, 384, 88 S. Ct. 967, 971 (1968); *Barley v. State*, 906 S.W.2d 27, 32-33 (Tex. Crim. App. 1995). We apply a two-step analysis to determine the admissibility of an in-court identification and ask (1) whether the pretrial identification procedure was impermissibly suggestive and, if so, (2) whether the improperly suggestive procedure created a very substantial likelihood of irreparable misidentification. *Simmons*, 390 U.S. at 384, 88 S. Ct. at 971; *Barley*, 906 S.W.2d at 33. If a court finds that a pretrial identification procedure was impermissibly suggestive, it must then consider the factors enumerated in *Neil v. Biggers* to determine whether the suggestive procedure gave rise to a substantial likelihood of irreparable misidentification. 409 U.S. 188,

199, 93 S. Ct. 375, 382 (1972).[9] A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive. *Barley*, 906 S.W.2d at 33-34.

In regard to the first step, we note that suggestiveness may be created by the manner in which a pretrial identification procedure is conducted. *Id.* at 33. For example, a police officer may point out the suspect or suggest that a suspect is included in a lineup or photographic array. *Id.* The content of a lineup or photographic array itself may be suggestive if the suspect is the only individual who closely resembles the description given by the witness. *Id.* Furthermore, an individual procedure may be suggestive or the cumulative effect of procedures may be suggestive. *Id.*

In a pretrial identification procedure, while the better practice may be to use as many individuals as possible who fit the defendant's description, it is not essential that all the individuals be identical in appearance. *Buxton v. State*, 699 S.W.2d 212, 216 (Tex. Crim. App.1985). Neither due process nor common sense requires such exactitude. *Id.* Although the individuals need not be identical in appearance to the

---

[9] These factors are: (1) the witness's opportunity to view the criminal, (2) the witness's degree of attention, (3) the accuracy of the witness's description of the suspect, (4) the level of certainty at the time of confrontation, and (5) the time between the crime and confrontation. *Id.*, 409 U.S. at 199-200, 93 S. Ct. at 382.

18

defendant, their similarities in appearance should provide a reasonable test for the witness's capacity to reliably identify the perpetrator. *Ford v. State*, 794 S.W.2d 863, 866 (Tex. App.—El Paso 1990, pet. ref'd).

Appellant challenges the lineup as suggestive, citing discrepancies between the ages, heights, and weights of appellant and the other individuals used in the lineup. At the pretrial hearing on appellant's motion, Houston Police Officer John Burmeister testified as to the manner in which the lineup was compiled. Burmeister requested five male inmates from the Houston Police Department jail who were Hispanic, wearing civilian clothing, and had features similar to appellant's. Also, Burmeister let appellant choose his place in the lineup. The record does reflect the existence of overall disparities in the ages, heights, and weights of appellant and the other individuals used in the lineup. However, the color photograph of the lineup in the record, labeled Defendant's Exhibit No. 6, reflects that each of the Hispanic men had a moustache, wore civilian clothes, and had similar physical characteristics. Generally, the photograph shows that the members of the lineup appear to be similar in age, height and build, with one notable exception—a man, not appellant, who obviously appears shorter and older than the rest of the members of the lineup. As noted above, neither due process nor common sense requires that all the individuals in a lineup be identical in appearance. *Buxton*, 699 S.W.2d at 216.

Appellant also challenges the lineup as suggestive because he was the only member of the lineup wearing a red shirt. However, the mere fact that appellant wore a red shirt did not render the lineup impermissibly suggestive. *See Epps v. State*, 811 S.W.2d 237, 244 (Tex. App.—Dallas 1991, no pet.) (holding photographic lineup was not suggestive when defendant wore red shirt). Here, the photograph of the lineup reveals that all of the men in the lineup wore short-sleeve shirts.

After our de novo review of the mixed question of law and fact presented, we hold that appellant has not shown by clear and convincing evidence that the pretrial lineup procedure was impermissibly suggestive. Accordingly, we further hold that the trial court did not err in denying appellant's motion to suppress Mercedes's pretrial lineup identification and her in-court identification of appellant as the driver of the white car in question.

We overrule points of error four and five.

## Law of Parties

In points of error seven and eight, appellant contends that his constitutional rights to due process and due course of law were violated because, as a party to the offense under section 7.02(b) and not the principal, his conviction was obtained without a showing that, at the time of the offense, he possessed the specific intent to commit murder.

20

Appellant argues that, under the applicable law, a person can be convicted of capital murder only if he "intentionally commits murder" in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, or obstruction or retaliation. *See* TEX. PEN. CODE ANN. § 19.03(a)(2). He also notes that a person acts "intentionally, or with intent," with respect to the nature of his conduct or a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result. *See id.* § 6.03(a) (Vernon 2003). Appellant asserts that "allowing a conviction without also requiring the culpable mental state required by the definition of the offense" impermissibly lowers the State's burden of proof of a defendant's "state of mind." He concludes that allowing a capital murder conviction "under the guise of the conspiracy theory of parties [section 7.02(b) of the Penal Code]" violates constitutional due process and due course of law requirements "by impermissibly dispensing with the intent required by the definition of capital murder, in fact, by dispensing with any intent whatsoever."

It is axiomatic that due process, under the Fourteenth Amendment, and due course of law, under Article I, section 13 of the Texas Constitution, require that every criminal conviction be supported by evidence that a rational fact finder could accept as sufficient to prove all of the elements of the offense beyond a reasonable doubt. *Richardson v. State*, 879 S.W.2d 874, 879 (Tex. Crim. App. 1993). Moreover, the

21

most basic and fundamental concept of criminal justice is that, in order to constitute a crime, the prohibited act must be accompanied by a mens rea. *Morissett v. United States*, 342 U.S. 246, 250-52, 72 S. Ct. 240, 243-44 (1952); *Cook v. State*, 884 S.W.2d 485, 487 (Tex. Crim. App. 1994). It is also true that section 7.02(b) allows for criminal responsibility to specifically apply to a defendant even though he has "no intent to commit" the collateral offense, "the felony actually committed." TEX. PEN. CODE. ANN. § 7.02(b).

However, contrary to appellant's assertion, section 7.02(b) does not dispense with the requirement of a culpable mental state in regard to a capital murder conviction under the law of parties. It provides that if, in the attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, "all conspirators are guilty of the felony actually committed, though having no intent to commit it, *if the offense was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy*." *Id.* (emphasis added).

The Third Court of Appeals has held that section 7.02(b) does not lack a mens rea requirement and is not facially unconstitutional in regard to defendants convicted of capital murder as conspirators to commit other felonies. *Gravis v. State*, 982 S.W.2d 933, 938 (Tex. App.—Austin 1998, pet. ref'd). The Court reasoned that:

22

While this section allows criminal responsibility for the conduct of another, thereby eliminating the necessity for proof of intent to commit the felony actually committed [capital murder], it does not excuse the state from proving a culpable mental state. In fact, the statute requires the state to show that the defendant had *both* the mens rea to engage in a conspiracy and the culpable mental state to commit the underlying, i.e., the intended felony. The mental state required for the underlying felony supplies the mens rea for the felony actually committed by the co-conspirator.

*Id.* We agree. Accordingly, we also hold that section 7.02(b) does not facially violate the Due Process Clause of the Fourteenth Amendment or Article I, Section 19 of the Texas Constitution in regard to defendants convicted of capital murder as conspirators to commit other felonies. *See id.*

We note that the record reveals evidence upon which a reasonable fact finder could have found that appellant should have anticipated a murder. Here, the record reflects that appellant was actively involved in the kidnapping of Mercedes, and he was present when a handgun was displayed and when Gonzales told Mercedes that he was going to kill her. Appellant also kept watch over Mercedes and her baby when Gonzalez and the unidentified assailant went to confront the complainant. After the shooting, in which the complainant was mortally wounded, appellant fled the scene in the white car with Gonzales and the unidentified assailant. Accordingly, we further hold that section 7.02(b), as applied to appellant in this case, did not violate the Due Process Clause of the Fourteenth Amendment or Article I, Section 19

23

of the Texas Constitution. *See id.* at 939.

We overrule points of error seven and eight.

## Cruel and Unusual Punishment

In points of error nine and ten, appellant contends that the mandatory imposition of a life sentence for the offense of capital murder violated his right to be free from cruel and unusual punishment, under the Eighth Amendment, and his right to be free from cruel or unusual punishment, under Article I, section 13 of the Texas Constitution, because, as a party to the offense under section 7.02(b) and not the principal, he lacked the specific intent to commit murder.

An individual adjudged guilty of a capital felony in a case in which the State does not seek the death penalty "shall" be punished by imprisonment for life. TEX. PEN. CODE ANN. § 12.31(a) (Vernon 2003). Under theses circumstances, a trial judge must sentence the defendant to life imprisonment. TEX. CODE CRIM. PROC. ANN. art. 37.071, § 1 (Vernon Supp. 2003).

Appellant asserts that both the United States Constitution and the Texas Constitution "require that capital punishment be based on 'individual consideration' of the defendant's culpability." *See Lockett v. Ohio*, 438 U.S. 586, 602, 98 S. Ct. 2954, 2963 (1978). He also asserts that both constitutions protect against "all punishments which, by their excessive length or severity, are greatly disproportionate

24

to the offenses charged." *See Weems v. United States*, 217 U.S. 349, 371, 30 S. Ct. 544, 550 (1910). Appellant argues that under *Enmund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368 (1982), the imposition of a mandatory life sentence for capital murder, absent any intent to commit or knowledge of the crime, constitutes cruel and unusual punishment.

In *Enmund*, the United States Supreme Court held that the Eighth and Fourteenth Amendments prohibited the imposition of the death penalty on a defendant who "neither took life, attempted to take life, nor intended to take life." 458 U.S. at 787-88, 102 S. Ct. at 3371-72. The Court noted that the Cruel and Unusual Punishment Clause of the Eighth Amendment is directed in part, "against all punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." *Id.*, 458 U.S. at 788, 102 S. Ct. at 3372. It reasoned that:

> For purposes of imposing the *death penalty*, Enmund's criminal culpability must be limited to his participation in the robbery, and his punishment tailored to his personal responsibility and moral guilt. *Putting Enmund to death* to avenge two killings that he did not commit and had no intention of committing or causing does not measurably contribute to the retributive end of ensuring that the criminal gets his just desserts.

*Id.*, 458 U.S. at 801, 102 S. Ct. at 3378 (emphasis added). Because its holding is limited to the application of the death penalty, *Enmund* is inapplicable to the present case because here, appellant received a mandatory sentence of life imprisonment. *See*

25

*Koonce v. State*, 654 S.W.2d 705, 711 (Tex. App.—Houston [14th Dist.] 1983, pet. ref'd).

In *Harmelin v. Michigan*, the United States Supreme Court expressly refused to extend the "individualized capital-sentencing doctrine" to an "individualized mandatory life in prison without parole sentencing doctrine." 501 U.S. 957, 995, 111 S. Ct. 2680, 2701-02 (1991). The Court held that a mandatory life sentence imposed on a defendant for possessing 672 grams of cocaine did not violate the Eighth Amendment. *Id.*, 501 U.S. at 995, 111 S. Ct. at 2701. The Court noted that "[t]here can be no serious contention . . . that a sentence which is not otherwise cruel and unusual becomes so simply because it is 'mandatory.'" *Id.* Thus, the Court re-affirmed that the United States Constitution does not require individualized sentencing when the death penalty is not at issue. *Id.*, 501 U.S. at 996, 111 S. Ct. at 2702.

As noted by the concurring justices in *Harmelin*, "the fixing of prison terms for specific crimes involves a substantive penological judgment that, as a general matter, is 'properly within the province of legislatures, not courts.'" *Id.*, 501 U.S. at 998, 111 S. Ct. at 2703 (Kennedy, J., O'Connor, J., and Souter, J., concurring) (quoting *Rummell v. Estelle*, 445 U.S. 263, 275-76, 100 S. Ct. 1133, 1140 (1980)). Here, the apparent concern of the Texas Legislature is that, often, a conspiracy to commit one

type of felony leads to the commission of other more serious felonies, including murder. Consistent with its authority, the Legislature decided that, if in their attempt to carry out a conspiracy to commit one felony, another felony is committed by one of the conspirators, "all conspirators are guilty of the felony actually committed." TEX. PEN. CODE ANN. § 7.02(b). Thus, the operation of sections 19.03(a)(2), 12.31(a) and 7.02(b) together reflects a societal decision that, when a person engages in a conspiracy to commit a felony and a murder is committed by one of the co-conspirators, he should, where the State does not seek the death penalty, be subjected to the serious penalty of incarceration for life. *See Rummel*, 445 U.S. 263, 278, 100 S. Ct. 1133, 1141.

Texas courts have consistently held that the life sentence required under section 12.31(a) of the Penal Code and article 37.071, section 1 of the Code of Criminal Procedure is not unconstitutional as cruel and unusual punishment under the Eighth Amendment and Article I, section 13 of the Texas Constitution. *Barnes v. State*, 56 S.W.3d 221, 239 (Tex. App.—Fort Worth 2001, pet. ref'd) (Eighth Amendment); *Buhl v. State*, 960 S.W.2d 927, 935-36 (Tex. App.—Waco 1998, pet. ref'd) (Eighth Amendment); *Laird v. State*, 933 S.W.2d 707,714 (Tex. App.—Houston [14th Dist.] 1996, pet. ref'd) (Eighth Amendment and Article I, section 13); *Prater v. State*, 903 S.W.2d 57, 59-60 (Tex. App.—Fort Worth 1995, no pet.) (Eighth Amendment and

Article I, section 13).

We are likewise convinced and further hold that the life sentence required under section 12.31(a) of the Penal Code and article 37.071, section 1 of the Code of Criminal Procedure does not constitute cruel or unusual punishment, under either the Eighth Amendment or Article 1, section 13 of the Texas Constitution, when a defendant has been convicted of capital murder under section 7.02(b) of the Penal Code.

In addition, because the record, as noted above, reveals evidence upon which a reasonable fact finder could have found that appellant should have anticipated that, during the course of the kidnapping, someone could be murdered, we hold that, as applied to appellant in this case, the life sentence required under section 12.31(a) of the Penal Code and article 37.071, section 1 of the Code of Criminal Procedure does not constitute cruel or unusual punishment under either the Eighth Amendment or Article 1, section 13 of the Texas Constitution.

We overrule points of error nine and ten.

## Conclusion

We affirm the judgment of the trial court.


Terry Jennings
Justice

Panel consists of Justices Hedges, Jennings, and Alcala.

Publish.  TEX. R. APP. P. 47.2(b).