

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-11-00029-CR

GARY WAYNE BRYANT                                    APPELLANT

V.

THE STATE OF TEXAS                                        STATE

----------

FROM THE 371ST DISTRICT COURT OF TARRANT COUNTY

----------

## MEMORANDUM OPINION[1]

----------

### I. INTRODUCTION

A jury convicted Appellant Gary Wayne Bryant of aggravated robbery with a deadly weapon and sentenced him to fifty-five years' confinement. In two points, Bryant argues that the trial court erred by admitting evidence of an extraneous offense and by refusing to exclude identification testimony. We will affirm.

---

[1]*See* Tex. R. App. P. 47.4.

## II. BACKGROUND

On Saturday morning, February 27, 2010, Elida Salas was at her home with her ten- and twelve-year-old daughters and her three-year-old nephew when someone knocked on the front door. Salas eventually answered the door, and a nicely dressed lady asked for Maria Gonzalez. When Salas told the lady that Maria Gonzalez lived across the street, an individual who Salas identified at trial as Bryant appeared from behind the lady with a gun, forced his way into Salas's house, grabbed her by the neck, and hit her head with the gun. Bryant, who was wearing a black bandana and a white cap, asked where Salas's husband and where "the money" was, and he locked two of the children in the bathroom and hit one of them on the head.[2] Bryant returned to Salas; asked about the combination to a safe in the house, which Salas did not know; hit her with the gun several more times; and searched the rest of the house while the lady who initially knocked on the front door watched over Salas. Bryant collected several items from around the house; took the keys to Salas's SUV; pulled the SUV up to the front door; and loaded the items, including a flat-screen television, into the SUV. When Bryant and the lady drove away, the television fell out of the back of the SUV and onto the street, and Bryant ran over the television several times with the SUV, leaving it in the street. Police later discovered the SUV at an apartment complex located about four or five blocks from Salas's residence.

---

[2]Salas's husband was working at the family's restaurant that morning.

Later in the day, Salas returned to her home after visiting the police station and the hospital and discovered a white cap in one of the children's bedrooms. A police officer collected the cap, and a major DNA profile that was discovered after testing genetic material found inside of the cap was later compared to the DNA profile from a buccal swab obtained from Bryant. The profile from the buccal swab matched the major profile from the cap, and a supervisor for the laboratory that conducted the DNA testing opined that the probability of finding a random individual with the same DNA profile as Bryant is one in 1.86 quadrillion.

Detective Ernie Pate interviewed Salas about six months after the robbery and showed her a photographic spread that included Bryant's photo. Salas identified Bryant as the person who had robbed her and was 100% sure of her choice.

At trial, Laura Montemeyor, an assistant manager at a pawn store, testified that Bryant pawned a gold men's ring on March 2, 2010. Salas identified the ring as belonging to her husband and said that Bryant took it during the robbery.

Authorities who investigated the robbery were also able to lift several prints from a few items at Salas's house, including the frame of the flat-screen television discarded in the street. Deborah Smith of the Fort Worth Police Department Crime Laboratory testified that a palm print lifted from the television matched Bryant's left palm.

During the punishment phase, Sarah Kind testified that in November 2009, she was working alone at a Subway restaurant in Rhome when a man entered

3

the store, pulled out a gun, climbed over the counter, and demanded money from the register, a safe, and a cash box. Kind recalled that the man ripped a phone cord from the wall and tied her up with it before leaving. Kind did not identify Bryant as the assailant, but Amber Moss, a forensic scientist, testified that she obtained a partial DNA profile from the telephone cord, that Bryant's DNA profile matched nine of fifteen "locations" on the partial profile from the telephone cord, and that Bryant could not be excluded as a contributor to the DNA profile from the telephone cord.

### III. IRRELEVANT EXTRANEOUS-OFFENSE PUNISHMENT EVIDENCE

In his first point, Bryant argues that the trial court abused its discretion by admitting evidence at the punishment phase of trial related to the November 2009 Subway armed robbery. Bryant contends that the trial court should not have admitted a video taken from the store security system, still photographs of the video footage, and photographs of the crime scene because the State failed to prove that he was the person responsible for committing the armed robbery.

Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tex. R. Evid. 401. During the punishment phase of trial, the State may offer evidence as to any matter the court deems relevant to sentencing, including evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt to have been committed by the defendant or for which he could be held criminally

4

responsible. Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West Supp. 2011). When presented with an appropriate objection, the trial court has the initial responsibility to determine the threshold issue of whether an extraneous offense is admissible. *See Mitchell v. State*, 931 S.W.2d 950, 953 (Tex. Crim. App. 1996). This threshold determination is not a finding by the trial court that the State has proved an extraneous offense beyond a reasonable doubt, but is instead a finding that sufficient evidence exists from which a jury could reasonably so find. *See Smith v. State*, 227 S.W.3d 753, 759–60 (Tex. Crim. App. 2007) ("Unless the extraneous misconduct evidence is such that the [jury] can rationally find the defendant criminally responsible for the extraneous misconduct, the trial court is not permitted to admit it at a punishment hearing."); *Arzaga v. State*, 86 S.W.3d 767, 781 (Tex. App.—El Paso 2002, no pet.). Then, the jury, as the exclusive factfinder, must determine whether or not the State has proved the extraneous offense beyond a reasonable doubt, and they should be so instructed when requested.[3] *Mitchell*, 931 S.W.2d at 954.

We review a trial court's decision to admit evidence, including evidence of an extraneous offense during the punishment phase, under an abuse of discretion standard. *Id.* at 953.

---

[3]The trial court instructed the jury that it could consider the extraneous-offense or bad-acts evidence in assessing Bryant's punishment only if the State proved beyond a reasonable doubt that Bryant committed the offense or that the offense was one for which he could be held criminally responsible.

The first item of extraneous-offense evidence that Bryant objected to was the surveillance video taken from the store security system. When the State offered the video in evidence, Kind had not identified Bryant as the person responsible for committing the armed robbery, nor had any other evidence been admitted linking Bryant to the offense. The following exchange occurred at the bench:

> [Defense counsel]: My ultimate objective is not to object, but I think that technically I would have an objection at this point if they don't show that what we're about to see is relevant to the Defendant. So I think they need to have her identify the Defendant as the person the tape is about. Then it becomes relevant, but I think at this point they haven't shown relevance, so I would have to object.
>
> [State]: . . . Right now, we're proving what happened in the offense. *It's our plan to connect him to it with other evidence and witnesses later*.
>
> [Defense counsel]: Well, at this point, I'm going to object that they haven't shown the relevance because they haven't shown that my client is the person who committed the robbery. . . .
>
> THE COURT: I'm going to overrule that objection. If it becomes an issue later on -- if at the end of this line of witnesses, you still feel you have that same objection, we'll take it up at that point.
>
> [Defense counsel]: Okay. *So you're basically letting it in on the assumption they're going to connect it up later*?
>
> THE COURT: *Yes*. [Emphasis added.]

As the State indicated at the bench conference, after Kind's testimony concluded, James Holland testified that he is a Texas Ranger, that he investigated the November 2009 Subway armed robbery, that Bryant became a

suspect at some point during the investigation, and that he obtained a search warrant for and collected a buccal swab from Bryant.

After Holland testified, Moss testified that she was able to obtain a partial DNA profile from the telephone cord used by the assailant to restrain Kind during the Subway armed robbery and that Bryant's DNA profile obtained from the buccal swab matched nine of fifteen "locations" on the partial profile from the telephone cord. Moss opined that Bryant could not be excluded as a contributor to the DNA profile from the telephone cord and that there was a one in 2.7 million likelihood of finding another random individual with similar DNA as the nine locations from the profile on the telephone cord.

At the conclusion of Moss's testimony, Bryant moved to strike all of the testimony regarding the Subway armed robbery on the same grounds that he had previously urged, and the trial court denied his motion.

The record thus demonstrates that although the State had not elicited testimony connecting Bryant to the Subway armed robbery when it offered the surveillance video and photographs in evidence during Kind's testimony, it subsequently offered evidence through Holland's and Moss's testimony from which the jury rationally could have determined that Bryant committed the Subway armed robbery. *See Mitchell*, 931 S.W.2d at 953; *see also Smith*, 227 S.W.3d at 759–60. The court of criminal appeals has reasoned that evidence should not be excluded merely because its relevance may depend upon the production of additional evidence at a later point in trial. *See Fuller v. State*, 829

7

S.W.2d 191, 198 (Tex. Crim. App. 1992), *cert. denied*, 508 U.S. 941 (1993), *overruled on other grounds by Castillo v. State*, 913 S.W.2d 529, 534 (Tex. Crim. App. 1995); *see also* Tex. R. Evid. 104(b). We see no reason why this standard should not have applied when the trial court made its admissibility determination of the extraneous-offense evidence at punishment, especially considering that the trial court had the opportunity to reconsider the same extraneous-offense evidence when Bryant reasserted his objection after Holland's and Moss's testimony.

Accordingly, to the extent that Bryant argues that the complained-of extraneous-offense evidence was irrelevant, we hold that the trial court did not abuse its discretion by admitting the evidence. To the extent that Bryant challenges the extraneous-offense evidence under article 37.07, we hold that in determining the threshold issue of admissibility of relevant evidence, the trial court did not abuse its discretion by admitting the extraneous-offense evidence on the condition that the State connect Bryant to the armed robbery through evidence elicited from witnesses other than Kind, which the State successfully did, and by determining that the extraneous-offense evidence was admissible. *See Mitchell*, 931 S.W.2d at 953.

Bryant also argues that even if the extraneous-offense evidence was relevant to his punishment and admissible, the trial court still abused its discretion by admitting the evidence because its probative value was substantially outweighed by the danger of unfair prejudice, confusion of the

8

issues, or one of the other countervailing considerations listed in rule of evidence 403. To preserve a complaint for our review, a party must have presented to the trial court a timely request, objection, or motion that states the specific grounds for the desired ruling if they are not apparent from the context of the request, objection, or motion. Tex. R. App. P. 33.1(a)(1); *Lovill v. State*, 319 S.W.3d 687, 691–92 (Tex. Crim. App. 2009). Bryant did not assert an objection to the extraneous-offense evidence under rule 403, nor was such an objection apparent from the context of his relevance objection. Accordingly, Bryant failed to preserve this part of his first point for appellate review. *See* Tex. R. App. P. 33.1(a)(1); *Lovill*, 319 S.W.3d at 691–92; *McClure v. State*, 269 S.W.3d 114, 119 (Tex. App.—Texarkana 2008, no pet.) (addressing appellant's rule 403 argument in relation to extraneous-offense evidence after observing that appellant "preserved this issue by first raising this objection during trial").

We overrule Bryant's first point.

## IV. IN-COURT IDENTIFICATION

In his second point, Bryant argues that the trial court erred by admitting Salas's in-court identification of Bryant because her testimony was tainted by an impermissibly suggestive pretrial identification procedure.

Whether a pretrial identification procedure was impermissibly suggestive is a mixed question of law and fact that does not turn on an evaluation of credibility and demeanor. *See Loserth v. State*, 963 S.W.2d 770, 773 (Tex. Crim. App. 1998). Therefore, we apply a de novo standard of review. *Id.*

9

An in-court identification is inadmissible when it has been tainted by an impermissibly suggestive pretrial identification procedure. *Id.* at 771–72. We use a two-step analysis in determining whether the trial court correctly admitted an in-court identification: (1) whether the out-of-court identification procedure was impermissibly suggestive, and if so, (2) whether the impermissibly suggestive procedure gave rise to the substantial likelihood of irreparable misidentification. *Barley v. State*, 906 S.W.2d 27, 33 (Tex. Crim. App. 1995), *cert. denied*, 516 U.S. 1176 (1996).

Suggestiveness may arise from the manner in which a pretrial identification procedure is conducted. *Id.* at 33–34. For example, a police officer may point out the suspect or suggest that a suspect is included in a lineup or photographic array. *Id.* Also, the content of a lineup or photographic array itself may be suggestive if the suspect is the only individual who closely resembles the description given by the witness. *Id.* But a photographic array is not impermissibly suggestive merely because each photograph can be distinguished in some manner from the photograph of the accused. *Page v. State*, 125 S.W.3d 640, 647 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). A defendant bears the burden of establishing by clear and convincing evidence that the pretrial identification procedure was impermissibly suggestive. *Barley*, 906 S.W.2d at 33–34; *Cienfuegos v. State*, 113 S.W.3d 481, 491 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd).

10

Bryant argues that the pretrial identification procedure used by Detective Pate was impermissibly suggestive because he told Salas that DNA was recovered from the white cap left at her home after the robbery and that the photograph of a suspect was included in the photographic spread. Salas testified at the hearing on Bryant's motion to suppress that she met with Detective Pate approximately six months after the robbery occurred and that he showed her six photographs and asked her if she could identify the person who committed the robbery. Salas recalled that Detective Pate did not tell her who to pick, did not give her any hints or clues, and told her to tell the truth. Salas looked at each of the photographs and, based on her recollection, put her initials on the photograph of the person who she recalled committed the robbery. At the time, Salas told Detective Pate, "I'm sure." Salas identified Bryant in court as the person who committed the robbery.

On cross-examination, Salas testified that Detective Pate did not tell her that the suspect was one of the six individuals in the photographs that she was about to view. The following thorough exchange took place between Salas, defense counsel, and the trial court regarding whether Detective Pate informed Salas that the suspect was included in the photographic spread:

> [Defense counsel]: Did the officer tell you that the suspect was one of the six people in the pictures that you were going to be looking at?

> [Salas]: No, he didn't tell me, so I pick. You know, he just showed me the pictures and I pick.

[Defense counsel]: All right. So your answer is: No, he did not tell me that?

[Salas]: I don't want you to twist like the question because, like I say, I don't understand very well English, so I don't want you twist the question and make me wrong, make me say wrong. So he gave me those pictures, and I pick, you know --

[Defense counsel]: I haven't asked you about that yet. I'm just asking you to focus on the questions I'm asking.

THE COURT: Let her finish her statement.

. . . .

[Salas]: Yes. Well, he showed me the pictures, and he brung me, you know, several pictures, and I pick -- I separate by groups, and I pick the right picture because I knew that -- those pictures was him, and I pointed, and I told him, "This is the picture. This is the man," and I sign it, and I give it to him.

THE COURT: What instructions did he give you before he showed you the pictures? What did he tell you?

[Salas]: What -- take your time and relax, and so if he is not -- if he is not a man in those pictures, you don't find it. So just take your time and, you know, do whatever you have to do it. So -- and I picked the -- I pulled, you know, in three groups the pictures, and I separate, and I separate his picture the last, and I put in the one side, and then after I through the other ones, and I keep his picture, and I told him, "This is it. This is him."

THE COURT: Did the detective ever tell you that the person who did the robbery was in the pictures?

[Salas]: He didn't told me. He didn't told me that the robbery was in those pictures. He just told me, "Just look at them," and so --

THE COURT: Did he ever tell you that the suspect was in the pictures?

[Salas]: He -- he just -- he just told me maybe he's in the pictures, maybe not, so….

12

THE COURT: Did he ever tell you the person whose DNA matched the crime scene or matched the --

[Salas]: No, he didn't tell me. No.

At trial,[4] Salas testified that Detective Pate did not tell her that she had to pick someone, that Detective Pate did not influence her when she was viewing the photographs, that she felt no pressure to identify someone, and that she chose Bryant's photograph based on what she remembered from the robbery. On cross-examination, Salas acknowledged that Detective Pate told her that the police had identified a suspect, but she seemed to give conflicting testimony about whether Detective Pate told her that a suspect's photograph was included in the photographic spread:

[Defense counsel]: And did he tell you that he had a suspect in the case?

[Salas]: Yes. He told -- he told me that he has -- yes, he told me that.

---

[4]In determining whether a trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *See Gutierrez v. State*, 221 S.W.3d 680, 687 (Tex. Crim. App. 2007); *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim. App.), *cert. denied*, 519 U.S. 1043 (1996). But this general rule is inapplicable when the parties consensually relitigated the suppression issue during trial on the merits. *Gutierrez*, 221 S.W.3d at 687; *Rachal*, 917 S.W.2d at 809. If, as in this case, the State raised the issue at trial either without objection or with subsequent participation in the inquiry by the defense, the defendant is deemed to have elected to reopen the evidence, and we may consider the relevant trial testimony in our review. *Rachal*, 917 S.W.2d at 809.

13

[Defense counsel]: Okay. And he told you that DNA in the hat that -- that the white beanie recovered from your house had been connected to the suspect; is that correct?

[Salas]: Yes.

[Defense counsel]: All right. And he said that the suspect was one of the pictures he's going to show you, but he didn't tell you which one?

[Salas]: No, he didn't tell me which one.

[Defense counsel]: Okay. And so when he showed you the pictures, though, you knew the suspect was one of them; you just didn't know which one it was going to be until you saw them?

[Salas]: Yes.

Among other things, Detective Pate testified that he read instructions to Salas before showing her the photographic spread, and one portion of those instructions stated that "[t]he fact that the photos are being shown to you should not cause you to believe or guess that the guilty person has been caught." He acknowledged that Salas knew that DNA had been recovered, but he did not answer affirmatively defense counsel's question whether he told Salas that the suspect's photograph was included in the photographic spread:

[Defense counsel]: All right. And you told her that the male that you suspected was one of the six people that she was going to be looking at; is that correct?

[Detective Pate]: I read her the instructions that were on the card that we -- have been marked.

The only evidence that arguably supports Bryant's contention that Salas knew that a suspect was included in the photographic spread is Salas's

14

conflicting testimony on cross-examination. The other relevant evidence overwhelmingly demonstrates that Detective Pate did not inform Salas that a suspect was included in the photographic spread before Salas viewed it. Consequently, we cannot conclude that Bryant met his burden to establish by clear and convincing evidence that the pretrial identification procedure used by Detective Pate was impermissibly suggestive. *See Barley*, 906 S.W.2d at 33–34.

We also conclude that even if the identification procedure was impermissibly suggestive, it did not give rise to a substantial likelihood of irreparable misidentification. Reliability is the critical question, and "if the totality of the circumstances reveals no substantial likelihood of misidentification despite a suggestive pretrial procedure, subsequent identification testimony will be deemed 'reliable.'" *Ibarra v. State*, 11 S.W.3d 189, 195 (Tex. Crim. App. 1999), *cert. denied*, 531 U.S. 828 (2000); *Webb v. State*, 760 S.W.2d 263, 269 (Tex. Crim. App. 1988), *cert. denied*, 491 U.S. 910 (1989). In assessing reliability, we consider the following factors: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness's degree of attention, (3) the accuracy of the witness's prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and confrontation. *Loserth*, 963 S.W.2d at 772; *see Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S. Ct. 375, 382 (1972). These five factors are reviewed deferentially in a light most favorable to the trial court's ruling and

15

then weighed de novo against the corrupting effect of the suggestive pretrial identification procedure. *Loserth*, 963 S.W.2d at 773–74.

Salas testified that she observed Bryant's face for about seven of the approximately thirty minutes that the robbery lasted and that she recalled certain features of his face and body. Salas also testified that instead of lying on the ground and pretending like she had fallen over, she watched Bryant and looked at his face while he loaded items into the SUV. The description that Salas gave to the police (black male, age twenty to twenty-six, about five feet seven inches tall, 170–180 pounds) was relatively accurate. Both Salas and Detective Pate recalled that Salas was 100% sure of her identification when she viewed the photographic spread. And the length of time between the crime and the identification was approximately six months. The totality of the circumstances reveals no substantial likelihood of misidentification; Salas's in-court identification of Bryant was reliable. *See Ibarra*, 11 S.W.3d at 195; *Loserth*, 963 S.W.2d at 772.

We hold that the trial court did not err by denying Bryant's motion to suppress Salas's identification testimony, and we overrule Bryant's second point.

## V. CONCLUSION

Having overruled both of Bryant's points, we affirm the trial court's judgment.

BILL MEIER
JUSTICE

PANEL:  DAUPHINOT, MEIER, and GABRIEL, JJ.

DO NOT PUBLISH
Tex. R. App. P. 47.2(b)

DELIVERED:  January 19, 2012